UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| BETINA CARVER HOWARD a/k/a ) | |
| TINA HOWARD and husband, ) | |
| ANTHONY HOWARD, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 2:10-0009 |
| ) | Judge Sharp |
| SMITH COUNTY, TENNESSEE, ) | |
| RONNIE LANKFORD, individually and ) | |
| in his official capacity as Sheriff of Smith ) | |
| County, Tennessee; CHRIS ) | |
| HUDDLESTON, individually and in his ) | |
| official capacity as an employee of the ) | |
| Smith County Sheriff's Department, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

This is an excessive force case that was removed from the Smith County Circuit Court. Presently pending is the Motion for Summary Judgment (Docket No. 17) filed by Defendants Smith County, Tennessee, Sheriff Ronnie Lankford ("Sheriff Lankford"), and Deputy Chris Huddleston ("Deputy Huddleston"). Plaintiffs Betina Carver Howard ("Mrs. Howard") and her husband, Anthony Howard ("Mr. Howard"), filed a response in opposition to the motion (Docket No. 35), to which Defendants have replied (Docket No. 37). The Court will grant the Motion for Summary Judgment on Plaintiffs' federal claims, and remand the state law causes of action to state court.

### I. FACTUAL BACKGROUND

For purposes of the Motion for Summary Judgment, the facts are construed in Plaintiffs' favor. In doing so, the Court relies on the statement of material facts submitted by Defendants, and

1

Plaintiffs' response thereto, in accordance with Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56(b) - (d). The Court has also considered the videotape of the incident that is a part of the record in this case.

Plaintiffs reside in Carthage, Tennessee. On January 4, 2009, Mrs. Howard, together with her brother, Jimmy Carver ("Mr. Carver"), went to a Chili's restaurant to celebrate his birthday. Over dinner, Mrs. Howard had one margarita, while Mr. Carver drank three or four alcoholic beverages. After dinner, the two went to Lebanon, Tennessee where Mrs. Howard smoked a marijuana joint with friends.

Mr. Carver then drove Mrs. Howard back to the Howard's residence. Mr. Carver overshot the driveway, did a u-turn in the street, and pulled into the Howard's driveway. Upon exiting the car, they heard a siren and saw a patrol car driven by Deputy Huddleston pull into the driveway.

Deputy Huddleston ordered one or both of them back into the vehicle.[1] Mr. Carver did as instructed, but Mrs. Howard stayed outside the vehicle.

Deputy Huddleston then approached the driver's side door and asked Mr. Carver whether he had been drinking. Mr. Carver responded that he had drank one beer, whereupon Deputy Huddleston asked Mr. Carver to perform a sobriety test. Mr. Carver indicated a willingness to comply.

When Deputy Huddleston began to administer the test, Mrs. Howard was standing approximately two feet behind him. Mrs. Howard yelled and cursed at Deputy Huddleston, and told him that she would not allow him to give her brother a field sobriety test in her driveway. She also

---

[1] Defendants claim that both Mrs. Howard and Mrs. Carter were ordered to get back into the vehicle, while Mrs. Howard insists she was not instructed to return to the vehicle. Ultimately, this dispute is not material to resolution of the summary judgment motion.

2

informed Deputy Huddleston that he "wasn't giving [her] brother a fucking DUI." (Docket No. 19-1, Mrs. Howard Depo. at 32). Deputy Huddleston told Mrs. Howard to step back. By now, Mr. Howard had come out onto the front porch of his house, and he told his wife to be quiet.

At about this point in time, backup officers arrived, including Officer Shane Gregory ("Officer Gregory") of the South Carthage Police Department. Officer Gregory's patrol unit was equipped with a dash-mounted camera. Because of where Officer Gregory parked, Deputy Huddleston, Mrs. Howard, and Mr. Carver, are not shown in the video from the camera, but the camera did capture audio commencing at 10:54 p.m.

As revealed from the audio of the on-board camera, as Deputy Huddleston was instructing Mr. Carver what to do in relation to the sobriety test, Mrs. Howard said, "he ain't going nowhere," to which Deputy Huddleston replied "you probably need to leave," and Mrs. Howard responded, "I ain't leaving 'cause I live here." Deputy Huddleston then stated, "do you want to go to jail? . . . If you open your mouth once more again," . . . "you probably need to stand back" . . . "if you don't have anything involved in this you need to go inside" . . . "ma'am, you need to step back there," . . . " "ma'am, you can either step back there, or I can put you back there." Deputy Huddleston delivered these statements in a calm voice.

After telling Mrs. Howard for at least the third time to step back, Mrs. Howard angrily yelled, "I ain't stepping back there" . . . "you're pushing me back there" . . . "you're already pushing me back there, sir, I don't give a fuck" . . . "you already pushed me back." Deputy Huddleston then announced, "alright, at this time, you are under arrest for disorderly conduct. I did not place you under arrest until you opened your mouth again."

Within a matter of seconds, Mrs. Howard was handcuffed and placed in a squad car. Deputy

3

Huddleston then turned his attention back to Mr. Caver, and resumed the sobriety test.

Mrs. Howard claims that, as she was walked backward to the nearby patrol car, she was "struggling to stay afoot." (Docket No. 36 at 6). She also claims that she was drug by the handcuffs, "while she was screaming that he [Deputy Huddleston] was hurting her." (Id.). However, the audio recording does not indicate Mrs. Howard said anything about being hurt as she was led to the patrol car.[2]

Mrs. Howard was transported by Sgt. Ronnie Maynard of the Smith County Sheriff's Department to the Sheriff's Office where she was booked on disorderly conduct, resisting arrest, drug possession, and possession of drug paraphernalia charges. The intake form indicates Mrs. Howard claimed no injuries. She was released on bond after approximately 15 minutes. All of the charges were later dismissed.

On January 7, 2009, three days after the event, Mrs. Howard went to her doctor complaining of wrist and forearm pain which she attributed to being pulled backward and handcuffed. She did not complain of shoulder pain, nor did she complain of shoulder pain or discomfort when she visited her doctor on March 2, 2009. It was not until a visit to her doctor on May 13, 2009, that Mrs. Howard complained of shoulder pain, which Mrs. Howard attributed to a fall.[3]

Based on these events, Plaintiffs filed suit in the Smith County Circuit Court raising a number of claims, including state law claims for assault and battery, aggravated assault, false arrest,

---

[2] In Scott v. Harris, 550 U.S. 372, 378 (2007), the Supreme Court held that even though a court is generally required to accept the nonmovant's version of the facts when ruling on a summary judgment motion, the same does not hold true when it is contradicted by a contemporaneous recording of the events.

[3] The Court includes these facts because Mrs. Howard claims that Deputy Huddleston injured her rotator cuffs when he pulled her backwards by the handcuffs.

4

false imprisonment, malicious prosecution, intentional infliction of emotional distress, negligent infliction of emotional distress, negligent hiring, outrageous conduct, excessive force, loss of consortium, and denial of medical treatment. They also raise federal constitutional claims for negligent hiring, failure to train and/or supervise, and excessive force.

## II. STANDARD OF REVIEW

The standards governing motions for summary judgment are well-known. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The nonmoving party then bears the burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

## III. APPLICATION OF LAW

Defendants move for summary judgment on all of Plaintiffs' claims. However, because the case was removed pursuant to federal question jurisdiction, and the Court has only supplemental jurisdiction over the state law claims, the Court first considers the federal claims.

5

A. **Federal Claims**

The federal claims in this case are brought pursuant to 42 U.S.C. § 1983 which, so far as relevant, provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

42 U.S.C. § 1983. Plaintiffs allege Mrs. Howard's Fourth and Fourteenth Amendment rights under the United States Constitution were violated as a result of Deputy Huddleston's conduct on January 4, 2009.

**1. Claims Against Smith County and Sheriff Lankford**

Plaintiffs seek to impose liability against Smith County and Sheriff Lankford under Section 1983 on the theory that Sheriff Lankford negligently hired and/or failed to supervise and/or properly train Deputy Huddleston. Plaintiffs have failed to marshal sufficient evidence to support such claims.

Under Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 692 (1978), a municipality is not liable under Section 1983 solely because it employs a tortfeasor. Instead, to hold a municipality liable under Section 1983, a plaintiff must identify a municipal policy or custom that caused plaintiff injury. Id. at 694. Monell also prohibits "imput[ing] liability onto supervisory personnel, . . . unless it is shown 'that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'" Ruiz v. Bouchard, 60 Fed. Appx. 572, 574 (6th Cir.

6

2003) (quoting, Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984)).[4]

There are, however, limited circumstances where the "failure to train" can be the basis for municipal liability under Section 1983, and that is "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 387 (1989). Thus, to succeed under a failure to train theory, a plaintiff must show that: "1) the [defendants'] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of [defendants'] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." Ciminillo v. Streicher, 434 F.3d 461, 469 (6th Cir. 2006). "'[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" Perez v. Oakland County, 466 F.3d 416, 430 (6th Cir. 2006) (citation omitted). "Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training." Sova v. City of Mt. Pleasant, 142 F.3d 898, 904 (6th Cir. 1998). "In other words, a municipality can be liable under § 1983 only where its policies are the 'moving force' behind the constitutional violation." Id. (quoting, Monell, 435 U.S. at 694).

Further, because Section 1983 liability must be based on more than *respondeat superior*, "'[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the

---

[4] Although Plaintiffs sue Sheriff Lankford in both his individual and official capacities, there is absolutely no basis for an individual capacity claim against him because "officials are personally liable under [Section 1983] 'only for their own unconstitutional behavior.'" Colvin v. Caruso, 605 F.3d 282, 292 (6th Cir. 2010) (citation omitted).

7

unconstitutional conduct of the offending subordinate.'" Walters v. Stafford, 317 Fed. Appx. 479, 486 (6th Cir. 2009) (quoting, Petty v. County of Franklin, 478 F.3d 341, 349 (6th Cir. 2007)).

Here, Plaintiffs argue they have stated a cognizable claim for negligent training and supervision because Sheriff Lankford admitted in his deposition that he was aware of no discipline that had been imposed at the Smith County's Sheriff 's Department, "some of the deputies were trained by J.D. Masters but that he is not aware of Master's qualifications to train and teach,"[5] and "the policy and procedure manual he had for the Smith County Sheriff's Department was not in effect when he took office and that the deputies followed verbal procedures." (Docket No. 35 at 10). Even if all of this is true, it does not state a failure to train or supervise claim under Section 1983.

There is not a scintilla of evidence before the Court that Sheriff Lankford encouraged or participated in Mrs. Howard's arrest, or her handling after the arrest. Nor is there any evidence that Deputy Huddleston's action ( if deemed unconstitutional) was anything but an anomaly, or, relatedly, that either Smith County or Sheriff Lankford was deliberately indifferent to the citizenry's constitutional rights in Smith County by ignoring a known problem. What the sparse record does show is that, at the time of the events in question, Deputy Huddleston was a fully qualified police officer, having successfully completed the police training school at the Tennessee Law Enforcement Academy. Plaintiffs' proof falls far short of showing that a lack of supervision or a failure to train was the "moving force" behind any alleged constitutional deprivation.

In addition to their negligent supervision and failure to train claims, Plaintiffs seek to hold Smith County and Sheriff Lankford liable under Section 1983 for negligent hiring. In this regard,

---

[5] In their opposition papers, Plaintiffs do not indicate who, or what, J.D. Masters is, or what sort of training he or it provides.

8

they argue that a lawsuit was pending against Deputy Huddleston when Sheriff Lankford took office (which subsequently settled for $255,000), and that Deputy Huddleston was taking prescription medication when he was hired by Sheriff Lankford.

Turning first to the latter assertion, Plaintiffs' negligent hiring claim fails if for no other reason than Plaintiffs do not identify what prescription drugs Deputy Huddleston was allegedly taking, let alone whether those drugs somehow played into the events of January 4, 2009. As the Supreme Court made clear in Bd. of County Comm'rs v. Byran County, 520 U.S. 397, 413-14 (1997), "[e]ven assuming . . . that proof of a single instance of inadequate screening could ever trigger municipal liability," for there to be liability, a employee's past record must show that "use of excessive force would be a plainly obvious consequence of the hiring decision":

> [A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that this officer was highly likely to inflict the *particular* injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong.

Id. at 412 (emphasis in original, citation omitted). This Court will not and cannot assume that simply because an applicant takes prescription medicine, he is highly likely to engage in excessive force when be becomes a police officer.

As for the prior lawsuit, Plaintiffs do not discuss its substance in their response brief, but a copy of the Smith County Circuit Court's Order approving the settlement is a part of the record in this case. (Docket No. 35-1). The Order indicates that, while still a reserve deputy, Deputy Huddleston accidentally struck a nine year old girl with his patrol car. That Deputy Huddleston may have been sued in the past for his alleged negligence in operating a motor vehicle says absolutely nothing about whether he would engage in excessive force in the future, let alone that a

9

"plainly obvious consequence" of hiring him as a full-time officer would be that he would pull an arrestee by her handcuffs and, in doing so, allegedly tear her rotator cuffs.

Accordingly, Defendants Smith County and Sheriff Lankford are entitled to summary judgment on Plaintiffs' federal claims.

### 2. Claims Against Deputy Huddleston

Plaintiffs allege that Deputy Huddleston violated Mrs. Howard's Fourth and Fourteenth Amendment rights by falsely arresting her and utilizing excessive force against her. Defendants argue that Mrs. Howard cannot show the deprivation of any constitutional right and, in any event, Deputy Huddleston is entitled to qualified immunity.

Qualified immunity is an affirmative defense which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity inquiry involves determining (1) whether a constitutional violation occurred and (2) whether the right infringed was clearly established. McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005). A court is to use its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

There is no doubt the right to be free from excessive force is clearly established because, in 1989, the Supreme Court held the use of force that is not objectively reasonable violates the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 388 (1989). Likewise, "the federal right to be subject only to arrest upon probable cause [i]s clearly established." Everson v. Leis, 556 F.3d 484,

500 (6th Cir. 2009). Nevertheless, Deputy Huddleston is entitled to qualified immunity because Plaintiffs have not shown that Mrs. Howard was arrested without probable cause, or that she was subjected to excessive force during the course of her arrest.

### a. Probable Cause

"Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). The determination of whether probable cause exists is based upon the "totality of the circumstances," id. at 238, with the critical question being "whether at the time of the arrest, 'the facts and circumstances within the [arresting officer's] knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person to conclude that an individual had either committed or was committing an offense.'" United States v. Torres-Ramos, 536 F.3d 542, 555 (6th Cir. 2008) (quoting, Beck v. Ohio, 379 U.S. 91 (1964)).

In this case, Mrs. Howard was arrested for disorderly conduct, among other things. Plaintiffs argue that probable cause did not exist to support the disorderly conduct charge, and cite for that proposition the Tennessee Code and the definition for "disorderly conduct" in BLACK'S LAW DICTIONARY.

So far as relevant, Tennessee's disorderly conduct statute provides:

(a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:

    (1) Engages in fighting or in violent or threatening behavior;

    (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or

    (3) Creates a hazardous or physically offensive condition by any act

11

>    that serves no legitimate purpose.
>
>    (b) A person also violates this section who makes unreasonable noise that prevents others from carrying on lawful activities.

Tenn. Code Ann. § 39-17-305. Plaintiffs insist that Mrs. Howard did nothing to violate the foregoing statute, arguing she "was simply annoying Deputy Huddleston by asking him questions, cussing at him, and questioning his authority." (Docket No. 35 at 13).

For purposes of qualified immunity, probable cause is determined from the perspective of a reasonable officer on the scene and "does not require evidence that is completely convincing[.]" Harris v. Borhorst, 513 F.3d 503, 511 (6th Cir. 2008). All that is required is a "'reasonable ground for belief of guilt.'" Id. (citation omitted).

A reasonable officer could conclude that Mrs. Howard was guilty of disorderly conduct since the Tennessee Supreme Court has held that a defendant's disregard of a police officer's instructions, coupled with a challenge to the officer's authority, can support a disorderly conduct charge. State v. Mitchell, 343 S.W.3d 381, 390-91 (Tenn. 2011). Additionally, a reasonable officer could believe Mrs. Howard violated subsection (b) because she made "unreasonable noise," by angrily yelling and cursing at Deputy Huddleston while standing directly behind him, and, in doing, prevented him from continuing on with the sobriety test of Mr. Carver.

Moreover, Plaintiffs err by focusing solely on the actual charges lodged against Mrs. Howard. In Devenpeck v. Alford, 543 U.S. 146, 153-55 (2004), the Supreme Court held that if an officer has probable cause to arrest a suspect for *any* crime, there is no Fourth Amendment violation, even where the police officer lacked probable cause to arrest for the actual offense charged. Thus, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the

12

offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

Under Tennessee law, "no person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic." Tenn. Code Ann. § 55-8-104. The statute is applicable even when an automobile moves from the public roadway onto private property. State v. Collazo, 2002 WL 440227 at *4 (Tenn. Crim. App. Mar. 18, 2002).

Here, a reasonable officer could conclude that Mrs. Howard violated the statute. Deputy Huddleston unquestionably had the authority to control traffic, he was engaged in a traffic stop, and Mrs. Howard repeatedly refused his direct commands to step back so that he could focus on determining whether Mr. Carver was impaired.

Because the material facts surrounding Mrs. Howard's arrest are not disputed[6] and because "'an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent,'" Parsons v. City of Pontiac, 533 F.3d 492, 501 (6th Cir. 2009) (citation omitted), summary judgment will be granted on Plaintiffs' false arrest claim.

### b. *Excessive Force*

Plaintiffs claim that Deputy Huddleston used excessive force in arresting Mrs. Howard. Specifically, in response to Defendants' Motion for Summary Judgment, Plaintiffs argue it was "not reasonable for [Deputy Huddleston] to drag [Mrs. Howard] backward, injuring her as a result."

---

[6] The Court notes that disputed factual issues underlying probable cause are for the jury to decide. However, probable cause is a legal question, and, therefore, there is no question for the jury if the undisputed facts are legally sufficient to establish probable cause. See, Hale v. Kart, 396 F.3d 721, 728 (6th Cir. 2005).

13

(Docket No. 35 at 14).

In Graham, 490 U.S. 386 (1989), the Supreme Court held "that *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." Graham, 490 U.S. at 395 (italics in original). The Court went on to hold that the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]" Id. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." Id.

In making the reasonableness calculation, Graham instructs courts to look at the severity of the crime, whether the subject posed an immediate threat to the safety of the officers or others, and whether the subject was resisting arrest. Id. Other factors which may be considered include "the need for the force, the degree of force applied, [and] the injuries inflicted[.]" Landis v. Baker, 297 Fed. Appx. 453, 462 (6th Cir. 2008).

Plaintiffs have failed to present a jury question on the issue of whether Deputy Huddleston used excessive force. Although disorderly conduct is generally not considered a violent crime, Carpenter v. Bowling, 276 Fed. Appx. 423, 426 (6th Cir. 2008), that is but one factor to be considered.

At the time Deputy Huddleston decided to arrest Mrs. Howard, it was not unreasonable for to assume that she posed a threat. After all, she was standing directly behind him, disregarding his direct commands, and haranguing him while is was attempting to deal with a driver who appeared

14

to be impaired.

Further, Plaintiffs have not shown that Deputy Huddleston used more than the force necessary to handcuff her and move her to the squad car. While Plaintiffs complain that Mrs. Howard was pulled or dragged to the car, and was struggling to stay afoot, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . , violates the Fourth Amendment." Graham, 490 U.S. 397. After all, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396; see, Saucier v. Katz, 533 U.S. 194, 208 (2001) (police officer was entitled to qualified immunity despite plaintiff's allegations he was shoved into a police van because "[a] reasonable officer in petitioner's position could have believed that hurrying [the plaintiff] away from the scene . . . was within the bounds of appropriate police responses").

In reaching this conclusion, the Court has considered Plaintiffs' contention that Mrs. Howard suffered injury to her shoulder, and that she attributes problems with her rotator cuffs to the events of January 4, 2009. However, her own medical records belie this contention because she did not complain about shoulder pain until some five months after her encounter with Deputy Huddleston and, when she did complain, she attributed shoulder injuries to a fall. Other evidence in the record bolsters this conclusion, including the videotape which reveals Mrs. Howard did not complain that she was in any pain, and the intake form which indicates she claimed no injuries on the night of the arrest.

The Court has also considered Plaintiffs' citation (without elaboration) to Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002) for the proposition that "excessively forceful handcuffing is a clearly established right for qualified immunity purposes." (Docket No. 35 at 13). Insofar as

15

Plaintiffs submit there exists a triable claim for "excessively forceful handcuffing," Burchett does not aid their position.

In Burchett, the Sixth Circuit affirmed the grant of summary judgment in a police officer's favor, even though the record showed plaintiff's hands became swollen and blue as a result of being cuffed. This was because, when plaintiff complained, the handcuffs were removed.

If anything, Burchett stands for the proposition that "[n]ot all allegations of tight handcuffing . . . amount to excessive force." Fettes v. Hendershot, , 375 Fed. Appx. 528, 533 (6th Cir. 2010). "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: '(1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing.'" Id. (quoting, Martin v. Heiderman, 106 F.3d 1308, 1313 (6th Cir. 1997)).

In response to Defendants' Motion for Summary Judgment, Plaintiffs have pointed to no evidence that shows Mrs. Howard complained that the handcuffs were too tight, and that Deputy Huddleston ignored her complaints. The recording of the incident confirms that Mrs. Howard did not complain about the handcuffs. This is important not only because Plaintiffs fail to meet the essential elements of an "excessive handcuffing" claim, but also because the Sixth Circuit in Fettes indicated that its "precedents fail to notify officers that any response to a complaint of tight handcuffing other than an immediate one constitutes excessive force." Id. at 534. "Indeed, a constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are 'too tight' is neither reasonable nor clearly established." Id. Without any indication of the nature of the complaints

16

and/or how long those complaints went unanswered, the Court is unable to determine whether Deputy Huddleston violated a clearly established right, let alone whether Mrs. Howard suffered a constitutional deprivation.

None of the foregoing is intended to suggest that, in order to present a triable issue, Plaintiffs must show anything other than *de minimus* injury because "a plaintiff may 'allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage.'" Morrison v. Bd. or Trustees of Green Twp., 583 F.3d 394, 407 (2009) (citation omitted). It is intended to suggest, however, that the Fourth Amendment protects only against gratuitous violence and the unreasonable use of force, neither of which have been shown in this case. Accordingly, Deputy Huddleston is entitled to summary judgment on Plaintiffs' excessive force claim.

**B. State Law Claims**

"Generally, 'if the federal claims are dismissed before trial, ... the state claims should be dismissed as well.'" Harper v. Auto Alliance Intern'l, Inc., 392 F.3d 195, 210 (6th Cir. 2004) (citation omitted). "Dismissal is not mandatory, however, because supplemental jurisdiction 'is a doctrine of discretion, not of plaintiff's right.'" Id. In exercising its "broad discretion" to decide whether to continue to exercise pendant jurisdiction over state-law claims, a court can consider such factors as "'the values of judicial economy, convenience, fairness and comity[.]'" Gamel v. City of Cincinnati, 625 F.3d 949, 952 (6th Cir. 2010) (citation omitted).

The Court's substantive involvement in this case has been limited to considering the record in relation to whether Plaintiffs have established a triable issue on the federal claims. Although the parties have completed discovery, "there is no suggestion that the same discovery will not be of

17

benefit to the parties in relation to litigating the state law claim in state court." Staehling v. Metro. Gov't of Nashville and Davidson County, 2008 WL 4279839 at * 13 (M.D. Tenn. Sept. 12, 2008). As such, "the concerns of judicial economy, convenience and fairness do not override the accepted principle that purely state law disputes should be decided in state court," id., and, the state law claims will be remanded the Smith County Circuit Court.

## IV. CONCLUSION

On the basis of the foregoing, the Court will enter an Order which grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' federal claims, and which remands Plaintiffs' state law claims to the Smith County Circuit Court.

*(signature)*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE